Christopher R. Dryden, Esq. (SBN 234476)
cdryden@attorneygl.com
James C. Huber, Esq. (SBN 269488)
jhuber@attorneygl.com
GLOBAL LEGAL LAW FIRM
322 Encinitas Blvd., Suite 200
Encinitas, CA 92024
Tel.: (888) 846-8901
Facsimile:  (888) 846-8902

Attorneys for Plaintiff
BUSINESS WARRIOR CORPORATION

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BUSINESS WARRIOR CORPORATION, a Wyoming corporation,<br><br>    Plaintiff,<br><br>    vs.<br><br>TIMOTHY LI, an individual, and DOES 1 through 10, inclusive,<br><br>    Defendant. | Case No.  8:22-cv-2144<br><br>**COMPLAINT FOR DAMAGES FOR**<br><br>I.    Breach of Fiduciary Duty<br>II.   Fraudulent Concealment<br>III.  Civil Theft – CA Penal Code §§ 484 and 496<br>IV.   Breach of Duty of Loyalty<br>V.    Unfair Competition in Violation of CA Bus. & Prof. Code §§ 17200 et seq. |

Business Warrior Corporation hereby claims against Timothy Li as follows.

## PARTIES

1.    At all times relevant to this action, Plaintiff, Business Warrior Corporation ("BWC"), was and now is a corporation, duly organized and existing under and by virtue of the laws of the State of Wyoming and maintains its principal place of business in the State of Nevada at 455 East Pebble Rd., Suite 230912, Las Vegas, Nevada 89123-0912.

2.    Defendant Timothy Li ("Li" and with BWC collectively referred to herein as the "Parties") is an individual who at all times relevant herein has been a resident

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-8901

1    of the County of Orange, State of California.

2        3.     Plaintiff is currently unaware of the true names and capacities of Does 1

3 through 10, inclusive (and with Li collectively referred to herein as "Defendants"),

4 whether individual, partnership, corporation, unincorporated association, foreign

5 individual, or entity, or otherwise, and therefore sues these Defendants by such

6 fictitious names. After discovery, which is necessary to ascertain the true names and

7 capacities of these Defendants, Plaintiff will amend the pleadings to allege the

8 necessary identifying details. Plaintiff is informed and believes, and on that basis

9 alleges that at all material times, each of Defendants, as well as Does 1 through 10,

10 was the agent, servant, employee, partner, joint venturer, representative, subsidiary,

11 parent, affiliate, alter ego, or co-conspirator of the others, had full knowledge of and

12 gave substantial assistance to the alleged activities, and in doing the things alleged,

13 each was acting within the scope of such agency, service, employment, partnership,

14 joint venture, representation, affiliation, or conspiracy, and each is legally responsible

15 for the acts and omissions of the others.

16        4.     Plaintiff is informed and believes, and based thereon alleges, that: (a)

17 there existed and now exists a unity of interest, ownership, and operation between

18 Defendants such that the individuality and separateness of Defendants has ceased to

19 exist, or never existed; and (b) the failure to disregard the separate corporate entity

20 would sanction a fraud or promote injustice. Plaintiffs are further informed and believe

21 and based thereon allege that recognition of the privilege of separate existence of the

22 Defendants would promote injustice because Defendants, and each of them, in bad

23 faith dominated and controlled each other.

24                        **JURISDICTION AND VENUE**

25        5.     This Court has jurisdiction over the parties hereto under 28 U.S.C. § 1332

26 because Li resides in California and BWC resides in Nevada, and the amount in

27 controversy exceeds the sum or value of $75,000, exclusive of interests or costs.

28        6.     Venue is proper in this Court pursuant to 28 USC § 1391(b) because Li

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

resides in Orange County and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this judicial district including without limitation organization of actions giving rise to theft and embezzlement, including the coordination of actions by communications arising from or being sent into this judicial district, and Plaintiff suffered substantial harm within this judicial district as a result of Defendant's misconduct as detailed below.

## FACTS COMMON TO ALL COUNTS

7.      At all times relevant to this action, Fluidfi, Inc. ("Alchemy"), was and now is a corporation, duly organized and existing under and by virtue of the laws of the State of California and maintains its principal place of business at 400 Spectrum Center Drive, Suite 350, Irvine, California 92618.

8.      BWC prior to its acquisition of Alchemy as detailed below, was and still is, a Software as a Service ("SaaS") company focused on helping small businesses solve two of the biggest challenges to owning and operating a business, namely, customer acquisition and access to financing. BWC's integrated platform combines a small business's advertising performance, financial data, and financing options as a key source of success and growth for business owners. Formed in 2014, BWC uses next-generation machine-learning and native software to make conversion marketing and growth financing accessible for small business owners.

9.      In 2021 BWC began expanding beyond just a marketing software company and began searching for a loan management system. BWC desired to increase its SaaS offerings to include turnkey lending solutions to high-growth companies. BWC desired to become a full-service provider with an end-to-end lending technology platform and customer acquisition marketing services.  After researching several companies, BWC decided to go with Alchemy.  To that end, BWC commissioned Alchemy to build BWC's funding platform in September 2021.

10.      In or around late February 2022, Li on behalf of Alchemy began socializing an "investment round" with clients and was in the process of hiring an investment broker.

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

BWC was strategically interested in combining Alchemy's financial technology with BWC's marketing technology. BWC was also clearly interested in Alchemy's investment deck's representation that Alchemy anticipated receipt of $8 Million in revenue for 2022. As these discussions progressed, BWC expressed an interest acquiring Alchemy vis-à-vis a forward triangular merger agreement instead of just being an investor. At that time, Alchemy was a wholly owned subsidiary of Constellation Fintech Holdings, LLC ("Constellation"), a California limited liability company.  And the majority shareholders were Li and his wife, Vy Thuy Li.

11.    Based thereon, BWC and Alchemy began discussions for BWC to acquire Alchemy. During those discussions, Li claimed the following:

a.    That Alchemy's turnkey lending platform would integrate with BWC's marketing platform; and

b.    Alchemy's true turnkey loan management system, Alchemy Express, was "90%" complete.

12.    In mid-April 2022, BWC and Alchemy entered a Letter of Intent with the material terms under which BWC would acquire all of Constellation's ownership interest in Alchemy (the "Transaction.")  Thereafter, until early June 2022, BWC conducted due diligence on Alchemy's business and assets from information requested by BWC and provided by Alchemy.

13.    As due diligence progressed, the Parties also agreed that once the Transaction was completed, Li would (a) cease working for Constellation or any of its affiliated companies including but not limited to Max Decisions, (b) enter an executive employment agreement with BWC to act as BWC's Global Head of Technology and President of Alchemy, now wholly owned by BWC, continuing to oversee the development and maintenance of Alchemy's technology purchased by BWC, and (c) be appointed as a Director of BWC.

14.    On or about June 8, 2022, BWC, BZ Merger Sub, a Delaware corporation wholly owned by BWC, Alchemy, Constellation and Li entered into that certain

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

1  Agreement and Plan of Reorganization to close the Transaction and transfer all equity
2  in Alchemy from Constellation to BWC vis-à-vis BZ Merger Sub (the "Agreement").
3  From that date forward BWC became the legal owner of Alchemy and all its assets,
4  including technology described in Paragraph 9 above.

5       15.     Pursuant to the Agreement, all control of Alchemy, including over its
6  financials, operations, and bank accounts, would be transferred over to BWC in the
7  thirty to sixty (30-60) day period following the execution of the Agreement (the
8  "Transition Period.")  However, from the date the Transaction closed, BWC owned all
9  right, title and interest in the equity of Alchemy despite not yet being in control.

10       16.     Concurrent with the closing of the Transaction and the execution of the
11  Agreement by the parties thereto as described above, on June 8, 2022, Li entered an
12  Executive Employment Agreement with BWC (the "Employment Agreement.")
13  Please find attached hereto as Exhibit 1 a true and correct copy of the Employment
14  Agreement.

15       17.     Under the Employment Agreement Li agreed *inter alia* to the following
16  material terms of his employment:

17       a.     Li became BWC's Global Head of Technology and would also
18  hold the title of President of Alchemy though being employed by BWC.

19       b.     Under Section 1(m) Li agreed that any work he performed during
20  his employment with BWC would be considered a "Work Made for Hire" as defined
21  in the U.S. Copyright laws and be owned by and for the express benefit of BWC. And
22  in the event, it should be established that such work did not qualify as a "Work Made
23  for Hire", Li agreed to assign to BWC all of his right, title and interest in such work
24  product including, but not limited to, all copyrights and other proprietary rights. In
25  furtherance thereof, under Schedule A Li agreed to and did assign to BWC, and its
26  respective affiliates and subsidiaries, all of his rights, title, and/or interest in such work
27  product, including, but not limited to, all copyrights, patents, trademarks, and propriety
28  rights including the source code and supporting codes created by Awcore and

TheeCode for Alchemy.

c.     Under Section 11(b) Li agreed that during his employment he would not compete with BWC by not acquiring, assuming or participating in, directly or indirectly, any position, investment or interest known by him to be adverse or antagonistic to BWC, its business, or prospects, financial or otherwise, or in any company, person, or entity that is, directly or indirectly, in competition with the BWC's business or any of its Affiliates. Ownership by Li, in professionally managed funds over which he did not have control or discretion in investment decisions, or as a passive investment, of less than two percent (2%) of the outstanding shares of capital stock of any corporation with one or more classes of its capital stock listed on a national securities exchange or publicly traded on a national securities exchange or in the over-the-counter market would not be a breach thereof if properly disclosed. For purposes of the Employment Agreement, "Affiliate," meant, with respect to any specific entity, any other entity that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified entity.

d.     Under Section 11(c) Li agreed that during his employment and for a twelve (12) month period thereafter he would not: (i) solicit or induce, or attempt to solicit or induce, any BWC employee, including all Development Team Members identified in Exhibit B thereto (which included Alchemy's India development team at TheeCode), or its Affiliates to leave BWC's or such Affiliate's employ; or (ii) use BWC's or Alchemy's confidential information to solicit or attempt to solicit the business of any client or customer of BWC, Alchemy, or their Affiliates with respect to products, services, or investments similar to those provided or supplied by BWC or its Affiliates.

e.     Under Section 11(d) Li agreed during his employment and for a twelve (12) month period thereafter he would not disparage BWC, Alchemy, or their respective officers, directors, employees, shareholders, or agents, in any manner likely

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

to be harmful to its or their businesses, business reputations, or personal reputations.

        f.    Under Section 24 Li agreed that the restrictions contained in the Employment Agreement were intended for the protection of BWC's interests in the acquired intellectual property, customer, client, merchant, and other business relationships, and goodwill, and were necessary, reasonable and appropriate purpose. Li further agreed that (i) his breach of his obligations under the Employment Agreement would likely cause BWC substantial and irrevocable damages and irreparable harm (which may be difficult to measure), (ii) without the obligation/restrictions undertaken by Li he would be in a position to compete unfairly with BWC, and (iii) his education and experience were such that any obligations/restrictions he agreed to would not unreasonably interfere with his ability to earn a livelihood. Accordingly, in the event of such breach by Li of his employment duties set forth above, BWC would be entitled to temporary, preliminary and permanent injunctive relief (in addition to all other remedies it may have for damages or otherwise, in law or equity) to restrain such breach or threatened breach, without proving actual damages and without posting of a bond.

18.    On or about June 18, 2022, Li, unbeknownst to BWC and without authorization therefrom, initiated a $200,000 transfer from Alchemy's bank account over which Constellation still had control, to Li's personal bank account at Chase Bank (the "Unauthorized Transfer.")  Li labeled the Unauthorized Transfer as employee payroll.

19.    On June 20, 2022, Li requested from Amy Wong, Constellation's primary employee for bookkeeping and accounting who was charged to assist in the transition of those items over to BWC, the Alchemy bank account login information which Ms. Wong provided Li.  It is important to note that on July 5, 2022, Ms. Wong categorized the transaction detail as a balance sheet item. The bank description combined with the categorization of the transfer led to a delay in the discovery of Li's fraud and embezzlement.

20.    On June 21, 2022, Nicole Houston, a business partner and principal at

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

Constellation asked Li about the Unauthorized Transfer.  Li claimed this was part of payment under the Transaction, which it was not.

21.    On June 22, 2022, Tim Li notated that the Unauthorized Transfer was for "Owner's Pay and Personal Expense Partner Distributions", despite the fact that Li was no longer an owner of Alchemy vis-à-vis Constellation, and Constellation no longer owned the funds in the Alchemy bank account from which the Unauthorized Transfer originated.

22.    At that time, the Unauthorized Transfer was discovered by Mr. Randy Schmidt, an executive of Alchemy prior to the Transaction and an employee of BWC thereafter.  Mr. Schmidt told Li that he was not authorized to make the Unauthorized Transfer since the funds were no longer owned by Constellation and that he should immediately return them otherwise it would be considered theft.  Li ignored Mr. Schmidt's suggestion.

23.    On or about June 29, 2022, BWC's accounting personnel and executives gained access to the Alchemy's bank account and QuickBooks for the first time.  Upon discovering the Unauthorized Transfer in July, BWC's accounting personnel and auditors flagged the Unauthorized Transfer as needing additional research as it was unclear since it was categorized a balance sheet item whether it was from a prior year.  At no time did Li notify BWC of the Unauthorized Transfer.

24.    In or around June 30, 2022, BWC became aware that Alchemy's primary software development team from India, TheeCode Technologies ("TheeCode"), had been contacting BWC's/Alchemy's customers purporting to them that they owned the source code and supporting codes BWC had purchased in the Transaction from Constellation.  Despite Li's awareness of TheeCode's misstatements, he did not notify BWC of their existence or attempt to assist BWC in managing any fallout with BWC's/Alchemy's customer relationships which were under attack.

25.    Thereafter, BWC's relationship with Li became strained as his behavior and compliance with his job duties became continually spottier as follows:

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

a.      On or about July 13, 2022, following BWC's discovery of issues related to Alchemy's operations and the need to make some changed to account for those issues which required the termination of multiple people who were simultaneously employed by BWC, Constellation and/or Constellation's affiliated companies following the close of the Transaction, Li became unresponsive to phone calls from BWC's President and Chief Executive Officer to assist with the closing the transition of Alchemy's operations from Constellation to BWC;

b.      On or about July 14, 2022, Li changed Alchemy passwords across Slack, Twitter, and Alchemy's e-mail server, locking out team members for an extended period of time and preventing it from performing its work obligations;

c.      On July 20, 2022, Li told BWC's/Alchemy's client, MedPlan, to stop paying invoices for services rendered dating back to February 2022;

d.      In August 2022, BWC discovered that Li had become an adjunct professor at USC without notifying BWC that he was engaged in employment with someone other than BWC;

e.      In September 2022, BWC discovered that Li had failed to disclose his investments in BWC's/Alchemy's customers and competitors, including but not limited to, ORKA Finance, Veradata, Crescent Funds and Solar Quote in excess of the amounts allowed under Section 11(b) of the Employment Agreement.  At that same time BWC also discovered from errant e-mails sent by Max Decisions' personnel to Li's BWC e-mail address that Li had continued his business development responsibilities for Max Decisions after he entered the Employment Agreement; and

f.      In September 2022, BWC, in its efforts to extinguish growing customer dissatisfaction, learned that Li has been disparaging BWC and its executive team while on phone calls with those customers and potential investors.

26.    In or around October 12, 2022, BWC's President, Mr. Jonathan Brooks, reviewed cash reports related to the Alchemy Audit and discovered the Unauthorized Transfer and its overall nature i.e., made to Li and purportedly for unpaid amounts

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

related to events that pre-dated the closing of the Transaction which were never disclosed or authorized by BWC.

27.     Mr. Brooks immediately notified BWC's Chief Executive Officer, Mr. Rhett Doolittle of the same. Mr. Doolittle then contacted Li over slack, an instant message program used for BWC's internal communications, inquiring about the Unauthorized Transfer. Li responded that the funds were for a "partnership distribution." In turn, Mr. Doolittle telephoned Li and demanded that he return the funds since they belonged to BWC, and that because BWC was a publicly traded entity it did not have partners and therefore no partner distributions. Li stated he would not return the funds and then hung up.

28.     On October 13, 2022, BWC, based primarily on Li's embezzlement of funds vis-a-vis the Unauthorized Transfer, and despite BWC's continued attempts to get Li to return the funds, terminated the Employment Agreement.

29.     On October 14, 2022, following Li's continued refusal to return the embezzled funds i.e., the Unauthorized Transfer, BWC filed a report with the Irvine Police Department. As of the date of this filing no action has been taken by the Irvine Police Department.

### **FIRST CAUSE OF ACTION**

**(Breach of Fiduciary Duty)**

**(By Li Against BWC)**

30.     BWC repeats each and every allegation set forth above as if set forth herein.

31.     As Alchemy's President and BWC's Global Head of Technology, Li owed BWC vis-à-vis Alchemy and its shareholders the fiduciary duties of utmost care and loyalty. Li had the obligation to conduct BWC's business honestly and in good faith, to act at all times in BWC's best interests and not in furtherance of his personal benefit, and not to take any actions calculated to harm BWC or its shareholders.

32.     Li breached his fiduciary duties of loyalty and care to BWC by taking the actions alleged herein, including but not limited to the acts described in Paragraphs

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

24-25 above and embezzling funds vis-à-vis the Unauthorized Transfer.

33.     As a direct and proximate result of Li's breaches of fiduciary duties, BWC has suffered very substantial monetary damages in an amount to be proven at trial but believed to significantly exceed $500,000.

34.     In breaching his fiduciary duties, Li acted with malice, fraud and oppression and in conscious disregard of BWC and its shareholders' rights. BWC is therefore entitled to an award of exemplary damages according to proof at trial.

### SECOND CAUSE OF ACTION

### (Fraudulent Concealment)

### (By Li Against BWC)

35.     BWC repeats each and every allegation set forth above as if set forth herein.

36.     By engaging in the wrongful actions described herein, Li deprived BWC and its shareholders of their rightful share of BWC's assets and value. Although Li owed BWC fiduciary duties of loyalty and to make full and complete disclosures of his conduct, which was directly contrary to BWC and its shareholders' rights and interests, Li fraudulently concealed the truth from them, intentionally hiding his efforts to divert to himself funds that rightfully belonged to BWC and its shareholders. Li intentionally misled BWC and its shareholders and fraudulently concealed from them his embezzlement and his fraud by such deceptive acts as scheduling Unauthorized Transfer and disguising it in QuickBooks as payroll in BWC's accounting books and records. Li did so to induce BWC and its shareholders to act (or refrain from acting) in reliance on Li's material omissions and misrepresentations.

37.     BWC and its shareholders were unaware of the true facts and justifiably relied on false and fraudulent information provided by Li by, among things, keeping Li on as Alchemy's President, continuing to allow him to access and control BWC's books and records during the transition period, and otherwise refraining from taking steps to protect their interests earlier.

38.     As a direct and proximate result of Li's breaches of fiduciary duties and

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

wrongful actions, BWC has suffered substantial monetary damages in an amount to be proven at trial but believed to significantly exceed $500,000.

39.     In fraudulently concealing his unlawful actions, Li acted with malice, fraud and oppression and in conscious disregard of BWC and its shareholders' rights. BWC is therefore entitled to an award of exemplary damages according to proof at trial.

## THIRD CAUSE OF ACTION

### (Civil Theft – Penal Code §§ 484, 496)

### (By Defendants Against BWC)

40.     BWC repeats each and every allegation set forth above as if set forth herein.

41.     California Penal Code § 484(a) provides that "Every person ... who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money ... or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property ... is guilty of theft." Additionally, Penal Code § 496(c) provides that "[a]ny person who has been injured by a violation of subdivision (a)... may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

42.     At all relevant times, Li intended to permanently deprive BWC of its money and property, and Li knowingly and by false pretenses did so deprive BWC of its money and property. Li knew of the wrongful nature of his actions to obtain wrongful possession of BWC's money and property.

43.     Li's conduct as alleged herein constitutes theft as defined in Penal Code §§ 484 and 496, and gives rise to liability under Penal Code § 496(c).

44.     Li's theft has proximately damaged BWC by depriving BWC of its money and property in an amount to be proven at trial, but believed to significantly exceed $500,000. Pursuant to Penal Code § 496(c), BWC is entitled to (i) three times the amount of actual damages, (ii) costs of suit and (iii) reasonable attorneys' fees.

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

1

## **FOURTH CAUSE OF ACTION**

2

### **(Breach of Duty of Loyalty)**

3

### **(By Li Against BWC)**

4      45.   BWC repeats each and every allegation set forth above as if set forth herein.

5      46.   At all times during his employment by BWC, Li owed BWC a duty of

6   complete loyalty to BWC's interests. At all times during the course of his employment

7   by BWC, Li was obligated to act solely and exclusively in BWC's best interests, and

8   was prohibited from acting in a manner contrary to BWC's legitimate business

9   interests.

10      47.   Li breached his duty of loyalty and obligations to BWC by committing

11   the acts more fully described in Paragraphs 24-26 above, before Li's termination from

12   BWC; and continued to work for Constellation and it affiliated entities such as Max

13   Decisions to BWC's detriment and potentially using the intellectual property BWC

14   purchased in the Transaction.

15      48.   Li also breached his duty of loyalty to BWC by making secret plans with

16   others, while still employed by BWC, to deprive BWC of its records, clients, and trade

17   secrets.

18      49.   As a direct and proximate result of Li's breach of his duties to BWC,

19   BWC has suffered and will continue to suffer irreparable injury and financial losses

20   that are incalculable at this time but in excess of the jurisdictional minimum.

21

## **FIFTH CAUSE OF ACTION**

22

### **(Unfair Competition in Violation of CA Bus. & Prof. Code §§ 17200 et seq.)**

23

### **(By Defendants Against BWC)**

24      50.   BWC repeats each and every allegation set forth above as if set forth herein.

25      51.   Li's conduct described above, specifically his violations of Penal Code

26   §§ 484 and 496, constitutes common law unfair competition and unfair competition in

27   violation of California Business and Professions Code §§ 17200 *et seq.* which

28   prohibits unlawful, unfair or fraudulent business practices.

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

13

52.     As a direct and proximate result of the acts and course of conduct of Li as described above, BWC has suffered and will continue to suffer irreparable injury and harm that is incalculable at this time but in excess of the jurisdictional minimum.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Business Warrior Corporation prays for judgment against Defendants joint and several as follows:

a.     Enter a Temporary Restraining Order and/or a Preliminary Injunction Order immediately restraining and enjoining Li and all persons acting in concert with his (including, but not limited to any officer, employee, agent or other representative of Constellation and Max Decisions), from directly or indirectly:

i.     Soliciting any business from any client or customer whom Li served during his employment with Business Warrior Corporation, or any other customer or client of Business Warrior Corporation whose name became known to Li while in the employ of Business Warrior Corporation;

ii.     Contacting for business purposes, whether in person, through others, by telephone or in writing, any client or customer of Business Warrior Corporation whom Li serviced during his employment with Business Warrior Corporation or whose name became known to Li while employed by Business Warrior Corporation; and

iii.     Using, disclosing, or transmitting for any purpose (including but not limited to solicitation of said clients), any information contained in the records of Business Warrior Corporation, including but not limited to the names, addresses, and financial information of said clients or customers.

b.     Requiring Li to preserve and make available for immediate inspection by Business Warrior Corporation or its expert all computer environments used by Li (including but not limited to desktop, laptop, and hand-held computers), whether they be utilized at Constellation, Max Decisions, Li's residence, or elsewhere;

c.     For judgment in favor of Business Warrior Corporation and against

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

14

Defendants for compensatory damages, in an amount to be determined at trial;

        d.     For judgment in favor of Business Warrior Corporation and against Defendants for compensatory damages for the harms suffered to Business Warrior Corporation's valuation, in an amount to be determined at trial;

        e.     For judgment in favor of Business Warrior Corporation and against Defendants for compensatory damages for the harms suffered to Business Warrior Corporation's reputation, in an amount to be determined at trial;

        f.     For an award of punitive damages in favor of Business Warrior Corporation and against Defendants;

        g.     For an award against Defendants of Business Warrior Corporation's reasonable attorney's fees and costs incurred in bringing this action;

        h.     For an award of pre and post judgment interest in favor of Business Warrior Corporation and against Defendants;

        i.     For an award of the equitable relief set forth herein; and

        j.     For such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

        Plaintiff hereby demands a trial by jury on all claims set forth in this Complaint.

Dated: November 28, 2022        GLOBAL LEGAL LAW FIRM

        By: _*/s/ Christopher R. Dryden*_

        Christopher R. Dryden, Esq.
        James C. Huber, Esq.
        Attorneys for Plaintiff
        BUSINESS WARRIOR
        CORPORATION

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

# EXHIBIT 1

# EXECUTIVE EMPLOYMENT AGREEMENT

THIS EXECUTIVE EMPLOYMENT AGREEMENT (this "*Agreement*"), dated as of  June 8 2022, (the "*Effective Date*") is made and entered by and between Business Warrior Corporation, a Wyoming corporation (the "*Company*") headquartered in Cheyenne, Wyoming, and Timothy Li (the "*Executive*"). The Company and Executive are hereinafter collectively referred to as the "*Parties*", and individually referred to as a *"Party"*. This Agreement supersedes any and all prior and contemporaneous oral or written employment agreements or arrangements between Executive and the Company.

## WITNESSETH:

WHEREAS, the Company desires assurance of the association and services of Executive in order to retain Executive's experience, skills, abilities, background and knowledge, and is willing to engage Executive's services on the terms and conditions set forth in this Agreement;

WHEREAS, Executive desires to be in the employ of the Company, and is willing to accept such employment on the terms and conditions set forth in this Agreement and the Company's employee handbook ("*Handbook*") reviewed and executed herewith;

WHEREAS, the Executive will be employed as the Company's Global Head of Technology ("*GHOT*") and President of Alchemy with primary responsibilities for financial and growth of the Company's subsidiary, Alchemy; as well as is expected to make major contributions to the short and long-term profitability, growth and technical strength of the Company as normally associated with the position of Global Head of Technology; Executive shall report to the Company's President, Jonathan Brooks.

WHEREAS, the Company has determined that appropriate arrangements should be taken to encourage the continued attention and dedication of the Executive to his assigned duties without distraction;

WHEREAS, the employment relationship between the Parties shall be governed by this Agreement and by the policies and practices established by the Company and/or the Company's Board of Directors (the "*Board*"), or any designated committee thereof. In the event that the terms of this Agreement differ from or are in conflict with the Company's policies or practices of the Handbook, this Agreement shall control;

WHEREAS, in consideration of the Executive's employment with the Company, the Company desires to provide the Executive with certain compensation and benefits as set forth in this Agreement in order to ameliorate the financial and career impact on the Executive in the event the Executive's employment with the Company is terminated for a reason related to, or unrelated to, a Change in Control (as defined below) of the Company.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements hereinafter set forth and intending to be legally bound hereby, the Company and the Executive agree as follows:

1. <u>Certain Defined Terms</u>. In addition to terms defined elsewhere herein, the following terms have the following meanings when used in this Agreement with initial capital letters:

(a) "**Annual Base Salary**" means the Executive's annual base salary rate, exclusive of bonuses, commissions and other incentive pay, as in effect immediately preceding Executive's Termination Date. As of the Effective Date, Executive's annual base salary is $200,000. All of Executive's compensation shall be subject to customary withholding taxes and any other employment taxes as are commonly required to be collected or withheld by the Company.

(b) "**Holidays and Vacations**" refers to Executive's eligibility to take an unlimited number of vacation days, with approval by the Executive's reporting manager.

(c) "**Cause**" means:

(i) an intentional tort (excluding any tort relating to a motor vehicle) which causes substantial loss, damage or injury to the property or reputation of the Company or its subsidiaries;

(ii) any serious crime or intentional, material act of fraud against the Company;

(iii) the commission of a felony that results in other than immaterial harm to the Company's business or to the reputation of the Company or Executive;

(iv) habitual neglect of Executive's reasonable duties (for a reason other than illness or incapacity) which is not cured within ten (10) days after written notice thereof by the Board to the Executive (which notice shall set forth in reasonable detail such breach and such action(s) reasonably necessary to cure breach);

(v) the disregard of written, material policies of the Company or its subsidiaries which causes other than immaterial loss, damage or injury to the property or reputation of the Company or its subsidiaries which is not cured within ten (10) days after written notice thereof by the Board to the Executive (which notice shall set forth in reasonable detail such breach and such action(s) reasonably necessary to cure breach); or

(vi) any material breach of the Executive's ongoing obligation not to disclose confidential information and not to assign intellectual property developed during employment which, if capable of being cured, is not cured within ten (10) days after written notice thereof by the Board to the Executive (which notice shall set forth in reasonable detail such breach and such action(s) reasonably necessary to cure breach).

(d) "**Change in Control**" means:

(i) any person or entity becoming the beneficial owner, directly or indirectly, of securities of the Company representing forty (40%) percent of the total voting power of all its then outstanding voting securities;

(ii) a merger or consolidation of the Company in which its voting securities immediately prior to the merger or consolidation do not represent, or are not converted into securities that represent, a majority of the voting power of all voting securities of the surviving entity immediately after the merger or consolidation;

(iii) a sale of substantially all of the assets of the Company or a liquidation or dissolution of the Company; or

(iv) individuals who, as of the date of the signing of this Agreement, constitute the Board of Directors (the "**Incumbent Board**") cease for any reason to constitute at least a majority of such Board; provided that any individual who becomes a director of the Company subsequent to the date of the signing of this Agreement, whose election, or nomination for election by the Company stockholders, was approved by the vote of at least a majority of the directors then in office shall be deemed a member of the Incumbent Board.

(e) "**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended.

(f) "**Disability**" means (i) the Executive has been incapacitated by bodily injury, illness or disease so as to be prevented thereby from engaging in the performance of the Executive's duties (provided, however, that the Company acknowledges its obligations to provide reasonable accommodation to the extent required by applicable law); (ii) such total incapacity shall have continued for a period of six (6) consecutive months; and (iii) such incapacity will, in the opinion of a qualified physician, be permanent and continuous during the remainder of the Executive's life.

(g) "**Good Reason Termination**" means:

(i) a material diminution in the Executive's base compensation or target bonus below the amount as of the date of this Agreement or as increased during the course of his employment with the Company, excluding one or more reductions (totaling no more than 20% in the aggregate) generally applicable to all senior executives provided, however, that such exclusion shall not apply if the material diminution in the Executive's base compensation occurs within (A) 60 days prior to the consummation of a Change in Control where such Change in Control was under consideration at the time of Executive's Termination Date or (B) twelve (12) months after the date upon which such a Change in Control occurs;

(ii) a material diminution in the Executive's authority, duties or responsibilities;

(iii) a requirement that the Executive report to a corporate officer or employee of the Company, other than the Company's Chief Executive Officer, instead of reporting directly to the Board (or if the Company has a parent corporation, a requirement that the Executive report to any individual or entity other than the board of the ultimate parent corporation of the Company);

(iv) a material diminution in the budget over which the Executive retains authority;

(v) a material change in the geographic location at which the Executive must perform services; or

(vi) any action or inaction that constitutes a material breach by the Company of this Agreement; provided, however, that for the Executive to be able to terminate his employment with the Company on account of Good Reason he must provide notice of the occurrence of the event constituting Good Reason and his desire to terminate his employment with the Company on account of such within ninety (90) days following the initial existence of the condition constituting Good Reason, and the Company must have a period of thirty (30) days following receipt of such notice to cure the condition. If the Company does not cure the event constituting Good Reason within such thirty (30) day period, the Executive's Termination Date

DocuSign Envelope ID: 7FFCF518-9B56-42BB-B374-7355652520AD

shall be the day immediately following the end of such thirty (30) day period, unless the Company provides for an earlier Termination Date.

(h) "**Restricted Stock**" means shares of Company common stock issued to the Executive subject to approval by the Board and subject to the terms of the Company's Equity Incentive Plan (the *"Plan"*).

(i) "**Sign-On Bonus**" means $150,000 to be paid to Executive within thirty (30) days of the Effective Date. All of Executive's compensation shall be subject to customary withholding taxes and any other employment taxes as are commonly required to be collected or withheld by the Company.

(j) "**Target Bonus**" means the target payout (i.e., at 100% achievement of each of the applicable metric(s) in effect from time to time) under the Company's Executive Annual Incentive Plan in effect for the Executive as of the Termination Date. As of the Effective Date, Executive's target bonus percentage under the Executive Annual Incentive Plan is 150% of annual base salary.

(k) "**Termination Date**" means the last day of Executive's employment with the Company.

(l) "**Termination of Employment**" means the termination of Executive's active employment relationship with the Company.

(m) Any work performed by Executive during Executive's employment with Company shall be considered a "Work Made for Hire" as defined in the U.S. Copyright laws, and shall be owned by and for the express benefit of Company. In the event it should be established that such work does not qualify as a Work Made for Hire, Executive agrees to and does hereby assign to Company all of Executive's right, title, and interest in such work product including, but not limited to, all copyrights and other proprietary rights.

2. <u>Termination Unrelated to a Change in Control</u>.

(a) <u>Involuntary Termination Unrelated to a Change in Control</u>. In the event of: (i) an involuntary termination of Executive's employment by the Company for any reason other than Cause, death or Disability, or (ii) Executive's resignation for Good Reason, and if Section 3 does not apply, Executive shall be entitled to the benefits provided in subsection (b) of this Section 2. Notwithstanding the forgoing, Executive may waive the benefits provided in subsection (b) of this Section 2 and in such case the Company shall waive the provisions of Section 11(c).

(b) <u>Compensation Upon Termination Unrelated to a Change in Control</u>. Subject to the provisions of Section 5 hereof, in the event a termination described in subsection (a) of this Section 2 occurs, the Company shall provide Executive with the following, provided that Executive executes and does not revoke the Release (as defined in Section 5):

(i) 1 time the sum of Annual Base Salary and Target Bonus**,** paid in a single lump sum cash payment on the sixtieth (60th) day following Executive's Termination Date. (For purposes of this subsection (i), Annual Base Salary will mean the largest among the following: Executive's annual base salary immediately prior to (A) Executive's Termination Date, or (B)

any reduction of Executive's base salary described in the first clause of subsection (i) in the definition of Good Reason. For purposes of this subsection (i), Target Bonus will mean the largest among the following: Executive's target bonus immediately prior to (A) Executive's Termination Date, or (B) any reduction of Executive's target bonus described in the first clause of subsection (i) in the definition of Good Reason.)

(ii) For a period of up to six (6) months following Executive's Termination Date, Executive and where applicable, Executive's spouse and eligible dependents, will continue to be eligible to receive medical coverage under the Company's medical plans in accordance with the terms of the applicable plan documents; provided, that in order to receive such continued coverage at such rates, Executive will be required to pay the applicable premiums to the plan provider, and the Company will reimburse the Executive, within 60 days following the date such monthly premium payment is due, an amount equal to the monthly COBRA premium payment, less applicable tax withholdings. Notwithstanding the foregoing, if Executive obtains full-time employment during this eighteen (18) month period that entitles him and his spouse and eligible dependents to comprehensive medical coverage, Executive must notify the Company and no further reimbursements will be paid by the Company to the Executive pursuant to this subsection. In addition, if Executive does not pay the applicable monthly COBRA premium for a particular month at any time during the eighteen (18) month period and coverage is lost as a result, no further reimbursements will be paid by the Company to the Executive pursuant to this subsection. Notwithstanding the above, if the Company determines in its sole discretion that it cannot provide the foregoing COBRA benefits without potentially violating applicable law (including, without limitation, Section 2716 of the Public Health Service Act), the Company shall in lieu thereof provide to Executive a taxable lump-sum payment in an amount equal to the monthly (or then remaining) COBRA premium that Executive would be required to pay to continue his group health coverage in effect on the Termination Date (which amount shall be based on the premium for the first month of COBRA coverage).

(iii) With respect to any **_Restricted Stock_** held by the Executive that remains unvested at the time of his Termination Date, the number of unvested shares of Restricted Stock that would have vested within the eight (8) month period after the Executive's Termination Date shall vest, and settle not later than sixty (60) days following the Termination Date. Except as provided in this Section 2(b)(iii) and in Section 3(b)(iv) below, any shares of Restricted Stock that are not vested as of Executive's Termination Date shall terminate.

(iv) With respect to shares of the Company's capital stock owned by the Executive, they shall not be forfeited on termination whether for cause or otherwise.

(v) Any amounts that have been accrued for the account of the Executive under the Company's Long Term Incentive Plan ("**_LTIP_**") that have not been released to the Executive as of the Termination Date shall be released to the executive, as applicable, in accordance with the terms of any applicable LTIP then in effect under the circumstances described therein as an involuntary termination other than for cause.

DocuSign Envelope ID: 7FFCF518-9B56-42BB-B374-73556525204D

(vi) With respect to any Performance-based Restricted Stock Units ("**PRUs**") held by the Executive that have not been released to the Executive pursuant to the terms of the applicable Performance Based Restricted Share Unit Award Agreement (the "**PRU Agreement**") as of the Termination Date shall be treated in accordance with the terms of the applicable PRU Agreement as an involuntary termination other than for cause.

(viii) Executive shall receive any amounts earned, accrued or owing but not yet paid to Executive as of his Termination Date, payable in a lump sum, and any benefits accrued or earned in accordance with the terms of any applicable benefit plans and programs of the Company.

3. <u>Termination Related to a Change in Control</u>.

(a) <u>Involuntary Termination Relating to a Change in Control</u>. In the event Executive's employment is terminated on account of (i) an involuntary termination by the Company for any reason other than Cause, death or Disability, or (ii) the Executive voluntarily terminates employment with the Company on account of a resignation for Good Reason, in either case that occurs (x) at the same time as, or within the twelve (12) month period following, the consummation of a Change in Control or (y) within the sixty (60) day period prior to the date of a Change in Control where the Change in Control was under consideration at the time of Executive's Termination Date, then Executive shall be entitled to the benefits provided in subsection (b) of this Section 3.

(b) <u>Compensation Upon Involuntary Termination Relating to a Change in Control</u>. Subject to the provisions of Section 5 hereof, in the event a termination described in subsection (a) of this Section 3 occurs, the Company shall provide that the following be paid to the Executive after his Termination Date, provided that Executive executes and does not revoke the Release:

(i) 1.5 times the sum of Annual Base Salary and Target Bonus, paid in a single lump sum cash payment on the sixtieth (60th) day following Executive's Termination Date. Notwithstanding the foregoing, to the extent Executive is entitled to receive the severance benefit payable pursuant to Section 2(b)(i) as a result of a qualifying termination prior to a Change in Control and then becomes entitled to receive the severance benefit payable pursuant to this Section 3 as a result of the Change in Control that was considered at the time of Executive's Termination Date becoming consummated within sixty (60) days following Executive's Termination Date, Executive shall not receive the severance benefit payable pursuant to Section 2(b)(i) of this Agreement, but instead shall receive the severance benefit payable pursuant to this Section 3(b)(i) on the sixtieth (60th) day following Executive's Termination Date. (For purposes of this subsection (i), Annual Base Salary will mean the largest among the following: Executive's annual base salary immediately prior to (A) Executive's Termination Date, (B) any reduction of Executive's base salary described in the first clause of subsection (i) in the definition of Good Reason, or (C) immediately prior to the Change in Control. For purposes of this subsection (i), Target Bonus will mean the largest among the following: Executive's target bonus (A) immediately prior to Executive's Termination Date, (B) immediately prior to any reduction of Executive's target bonus described in the first clause of subsection (i) in the definition of Good Reason, (C) immediately prior to the Change in Control, or (d) for the fiscal year preceding the year in which the Change in Control.)

(ii) For a period of up to twelve (12) months following Executive's Termination Date, Executive and where applicable, Executive's spouse and eligible dependents, will continue to be eligible to receive medical coverage under the Company's medical plans in accordance with the terms of the applicable plan documents; provided, that in order to receive such continued coverage at such rates, Executive will be required to pay the applicable premiums to the plan provider, and the Company will reimburse the Executive, within sixty (60) days following the date such monthly premium payment is due, an amount equal to the monthly COBRA (or, as applicable, other) premium payment, less applicable tax withholdings. Notwithstanding the foregoing, if Executive obtains full-time employment during this twenty-four (24) month period that entitles him and his spouse and eligible dependents to comprehensive medical coverage, Executive must notify the Company and no further reimbursements will be paid by the Company to the Executive pursuant to this subsection. In addition, if Executive does not pay the applicable monthly COBRA (or other) premium for a particular month at any time during the twenty-four (24) month period and coverage is lost as a result, no further reimbursements will be paid by the Company to the Executive pursuant to this subsection. Notwithstanding the foregoing, to the extent Executive is entitled to receive the severance benefit provided pursuant to Section 2(b)(ii) of the Agreement as a result of a qualifying termination prior to a Change in Control, if Executive becomes entitled to receive the severance benefits payable pursuant to this Section 3 as a result of the Change in Control that was considered at the time of Executive's Termination Date becoming consummated within sixty (60) days following Executive's Termination Date, Executive shall be entitled to receive the severance benefit provided pursuant to this clause (ii) and not the benefit provided pursuant to Section 2(b)(ii). Notwithstanding the above, if the Company determines in its sole discretion that it cannot provide the foregoing COBRA benefits without potentially violating applicable law (including, without limitation, Section 2716 of the Public Health Service Act), the Company shall in lieu thereof provide to Executive a taxable lump-sum payment in an amount equal to the monthly (or then remaining) COBRA premium that Executive would be required to pay to continue his group health coverage in effect on the Termination Date (which amount shall be based on the premium for the first month of COBRA coverage).

(iii) With respect to any outstanding Company stock options or grants held by the Executive as of his Termination Date, the Company shall fully accelerate the vesting and exercisability of such stock options, so that all such stock grants or options shall be fully vested and exercisable as of Executive's Termination Date, such options (as well as any outstanding stock options that previously became vested and exercisable) to remain exercisable, notwithstanding anything in any other agreement governing such options, until the earlier of (A) a period of one year after the Executive's Termination Date, or (B) the original term of the option. Notwithstanding the foregoing, to the extent Executive is entitled to receive the vesting and exercisability acceleration provided pursuant to Section 2(b)(iii) of the Agreement as a result of a qualifying termination prior to a Change in Control, if Executive becomes entitled to receive the severance benefits payable pursuant to this Section 3 as a result of the Change in Control that was considered at the time of Executive's Termination Date becoming consummated within sixty (60) days following Executive's Termination Date, any outstanding stock options that did not become vested and exercisable pursuant to Section 2(b)(iii) shall become vested and exercisable as of the date of the Change in Control; provided, however, if a Change in Control does not occur within sixty (60) days following Executive's Termination Date, any stock options held by

DocuSign Envelope ID: 7FFCF513-9B56-42BB-B374-7355E5E5204D

Executive that are not vested and exercisable shall terminate as of the sixtieth (60th) day following Executive's Termination Date or the end of the term, if earlier.

(iv) With respect to any Restricted Stock Units held by the Executive that are unvested at the time of his Termination Date, all such unvested Restricted Stock Units shall vest and settle not later than sixty (60) days following the Termination Date. Notwithstanding the foregoing, to the extent Executive is entitled to receive the vesting acceleration provided pursuant to Section 2(b)(iv) of the Agreement as a result of a qualifying termination prior to a Change in Control, if Executive becomes entitled to receive the severance benefits payable pursuant to this Section 3 as a result of the Change in Control that was considered at the time of Executive's Termination Date becoming consummated within sixty (60) days following Executive's Termination Date, any outstanding Restricted Stock Units that did not become vested pursuant to Section 2(b)(iv) shall become vested as of the date of the Change in Control; provided, however, if a Change in Control does not occur within sixty (60) days following Executive's Termination Date, any Restricted Stock Units held by Executive that are not vested shall terminate as of the sixtieth (60th) day following Executive's Termination Date.

(v) Any amounts that have been accrued for the account of the Executive under the LTIP that have not been released to the Executive as of the Termination Date shall be released to the executive, as applicable, in accordance with the terms of any applicable LTIP then in effect under the circumstances described therein as a "Change of Control of the Company" (as defined therein).With respect to any PRUs held by the Executive that have not been released to the Executive pursuant to the terms of the applicable PRU Agreement as of the Termination Date shall be treated in accordance with the terms of the applicable PRU Agreement as a "Change of Control of the Company" (as defined therein).

(vii) Executive shall receive any amounts earned, accrued or owing but not yet paid to Executive as of his Termination Date, payable in a lump sum, and any benefits accrued or earned in accordance with the terms of any applicable benefit plans and programs of the Company.

(c) <u>Consequence of a Change in Control</u>. Executive shall be entitled to full or partial accelerated vesting (as applicable) of the shares subject to his outstanding stock options effective upon the effective date of a Change of Control (as defined below), as follows: Executive shall receive immediate accelerated vesting and exercisability of one hundred percent (100%) of the then-unvested shares subject to each of Executive's outstanding stock options (or other equity compensation). The provisions of this Section 3(c) shall be contained in Executive's option agreements (or other equity compensation agreements) and although contingent upon Executive's continued employment with the Company, shall not be contingent upon the continued effectiveness of this Agreement.

4. <u>Termination of Employment on Account of Disability, Death, Cause or Voluntarily Without Good Reason</u>.

(a) <u>Termination on Account of Disability</u>. Notwithstanding anything in this Agreement to the contrary, if Executive's employment terminates on account of Disability, Executive shall be entitled to receive disability benefits under any disability program maintained by the

DocuSign Envelope ID: 3FFCF518-9B56-42BB-B374-73556525204D

Company that covers Executive, and Executive shall not receive benefits pursuant to Sections 2 and 3 hereof, except that, subject to the provisions of Section 5 hereof, the Executive shall be entitled to the following benefits provided that Executive executes and does not revoke the Release:

(i) For a period of up to eighteen (18) months following Executive's Termination Date, Executive and where applicable, Executive's spouse and eligible dependents, will continue to be eligible to receive medical coverage under the Company's medical plans in accordance with the terms of the applicable plan documents; provided, that in order to receive such continued coverage at such rates, Executive will be required to pay the applicable premiums to the plan provider, and the Company will reimburse the Executive, within 60 days following the date such monthly premium payment is due, an amount equal to the monthly COBRA premium payment, less applicable tax withholdings. Notwithstanding the foregoing, if Executive obtains full-time employment during this eighteen (18) month period that entitles him and his spouse and eligible dependents to comprehensive medical coverage, Executive must notify the Company and no further reimbursements will be paid by the Company to the Executive pursuant to this subsection. In addition, if Executive does not pay the applicable monthly COBRA premium for a particular month at any time during the eighteen (18) month period and coverage is lost as a result, no further reimbursements will be paid by the Company to the Executive pursuant to this subsection. Notwithstanding the above, if the Company determines in its sole discretion that it cannot provide the foregoing COBRA benefits without potentially violating applicable law (including, without limitation, Section 2716 of the Public Health Service Act), the Company shall in lieu thereof provide to Executive a taxable lump-sum payment in an amount equal to the monthly (or then remaining) COBRA premium that Executive would be required to pay to continue his group health coverage in effect on the Termination Date (which amount shall be based on the premium for the first month of COBRA coverage).

(ii) With respect to any outstanding Company stock options held by the Executive as of his Termination Date that are not vested and exercisable as of such date, the Company shall fully accelerate the vesting and exercisability of such stock options, so that all such stock options shall be fully vested and exercisable as of the Executive's Termination Date, such options (as well as any outstanding stock options that previously became vested and exercisable) to remain exercisable, notwithstanding anything in any other agreement governing such options, until the earlier of (A) a period of one year after the Executive's Termination Date, or (B) the original term of the option.

(iii) With respect to any Restricted Stock held by the Executive that are unvested at the time of his Termination Date, all such unvested Restricted Stock shall vest and settle not later than sixty (60) days following his Termination Date.

(iv) Any amounts that have been accrued for the account of the Executive under the LTIP that have not been released to the Executive as of the Termination Date shall be released to the executive, as applicable, in accordance with the terms of any applicable LTIP then in effect under the circumstances described therein as a termination by reason of total and permanent disability.

(v) With respect to any PRUs held by the Executive that have not been released to the Executive pursuant to the terms of the applicable PRU Agreement as of the Termination Date shall be treated in accordance with the terms of the applicable PRU Agreement as a termination of employment by reason of total and permanent disability.

9

(vi) With respect to any PCSUs held by the Executive that have not been released to the Executive pursuant to the terms of the applicable PCSU Agreement as of the Termination Date shall be treated in accordance with the terms of the applicable PCSU Agreement as a termination of employment by reason of total and permanent disability.

(b) <u>Termination on Account of Death</u>. Notwithstanding anything in this Agreement to the contrary, if Executive's employment terminates on account of death, Executive shall be entitled to receive death benefits under any death benefit program maintained by the Company that covers Executive, and Executive not receive benefits pursuant to Sections 2 and 3 hereof, except that, subject to the provisions of Section 5 hereof, the Executive shall be entitled to the following benefits provided that Executive's estate executes and does not revoke the Release:

(i) With respect to any outstanding Company stock options held by the Executive as of his death that are not vested and exercisable as of such date, the Company shall fully accelerate the vesting and exercisability of such stock options, so that all such stock options shall be fully vested and exercisable as of the Executive's death, such options (as well as any outstanding stock options that previously became vested and exercisable) to remain exercisable, notwithstanding anything in any other agreement governing such options, until the earlier of (A) a period of one year after the Executive's death or (B) the original term of the option.

(ii) With respect to any Restricted Stock held by the Executive that are unvested at the time of his death, all such unvested Restricted Stock shall vest and settle not later than sixty (60) days following his death.

(iii) Any amounts that have been accrued for the account of the Executive under the LTIP that have not been released to the Executive as of his death shall be released to the executive, as applicable, in accordance with the terms of any applicable LTIP then in effect under the circumstances described therein as a termination by reason of death.

(iv) With respect to any PRUs held by the Executive that have not been released to the Executive pursuant to the terms of the applicable PRU Agreement as of his death shall be treated in accordance with the terms of the applicable PRU Agreement as a termination of employment by reason of death.

(v) With respect to any PCSUs held by the Executive that have not been released to the Executive pursuant to the terms of the applicable PCSU Agreement as of his death shall be treated in accordance with the terms of the applicable PCSU Agreement as a termination of employment by reason of death.

(c) <u>Termination on Account of Cause</u>. Notwithstanding anything in this Agreement to the contrary, if Executive's employment terminates by the Company on account of Cause, Executive shall not receive benefits pursuant to Sections 2 and 3 hereof.

(d) <u>Termination on Account of Voluntary Resignation Without Good Reason</u>. Notwithstanding anything in this Agreement to the contrary, if Executive's employment terminates on account of a resignation by Executive for no reason or any reason other than on account of Good Reason, Executive shall not receive benefits pursuant to Sections 2 and 3 hereof.

5. <u>Release</u>. Notwithstanding the foregoing, no payments or other benefits under this Agreement shall be made unless Executive executes, and does not revoke, the Company's

DocuSign Envelope ID: 3FFCF518-9B56-42BB-B374-7355652520 4D

standard written release, substantially in the form as attached hereto as Annex A (the "Release"), of any and all claims against the Company and all related parties with respect to all matters arising out of Executive's employment by the Company (other than entitlements under the terms of this Agreement or under any other plans or programs of the Company in which Executive participated and under which Executive has accrued or become entitled to a benefit) or a termination thereof, with such release being effective not later than sixty (60) days following Executive's Termination Date.

6. <u>No Mitigation Obligation</u>. Executive shall not be required to mitigate the amount of any payment or benefit provided for in this Agreement by seeking other employment or otherwise, nor shall the amount of any payment or benefit provided for herein be reduced by any compensation earned by other employment or otherwise.

7. <u>Employment Rights</u>. Nothing expressed or implied in this Agreement will create any right or duty on the part of the Company or the Executive to have the Executive remain in the employment of the Company or any subsidiary prior to or following any Change in Control.

9. <u>Tax Matters</u>

(a) <u>Withholding of Taxes</u>. The Company may withhold from any amounts payable under this Agreement all federal, state, city or other taxes as the Company is required to withhold pursuant to any applicable law, regulation or ruling.

(b) <u>Parachute Excise Tax</u>. In the event that any amounts payable under this Agreement or otherwise to Executive would (i) constitute "parachute payments" within the meaning of section 280G of the Internal Revenue Code of 1986, as amended (the "Code"), or any comparable successor provisions and (ii) but for this Subsection (b) would be subject to the excise tax imposed by section 4999 of the Code or any comparable successor provisions (the "***Excise Tax***"), then such amounts payable to Executive hereunder shall be either:

(i) Provided to Executive in full; or

(ii) Provided to Executive to the maximum extent that would result in no portion of such benefits being subject to the Excise Tax;

whichever of the foregoing amounts, when taking into account applicable federal, state, local and foreign income and employment taxes, the Excise Tax and any other applicable taxes, results in the receipt by Executive, on an after-tax basis, of the greatest amount of benefits, notwithstanding that all or some portion of such benefits may be taxable under the Excise Tax. Unless the Company and Executive otherwise agree in writing, any determination required under this Subsection (b) shall be made in writing in good faith by a nationally recognized accounting firm (the "Accountants"). In the event of a reduction in benefits hereunder, the reduction of the total payments shall apply as follows, unless otherwise agreed in writing and such agreement is in compliance with section 409A of the Code: (i) any cash severance payments subject to Section 409A of the Code due under this Agreement shall be reduced, with the last such payment due first forfeited and reduced, and sequentially thereafter working from the next last payment, (ii) any cash severance payments not subject to Section 409A of the Code due under this Agreement shall be reduced, with the last such payment due first forfeited and reduced, and sequentially thereafter working from the next last payment; (iii) any acceleration of vesting of any equity

subject to Section 409A of the Code shall remain as originally scheduled to vest, with the tranche that would vest last (without any such acceleration) first remaining as originally scheduled to vest; and (iv) any acceleration of vesting of any equity not subject to Section 409A of the Code shall remain as originally scheduled to vest, with the tranche that would vest last (without any such acceleration) first remaining as originally scheduled to vest. For purposes of making the calculations required by this Subsection (b), the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good-faith interpretations concerning the application of the Code and other applicable legal authority. The Company and Executive shall furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under this Subsection (b). The Company shall bear all costs that the Accountants may reasonably incur in connection with any calculations contemplated by this Subsection (b).

If, notwithstanding any reduction described in this Subsection (b), the Internal Revenue Service ("*IRS*") determines that Executive is liable for the Excise Tax as a result of the receipt of amounts payable under this Agreement or otherwise as described above, then Executive shall be obligated to pay back to the Company, within thirty (30) days after a final IRS determination or, in the event that Executive challenges the final IRS determination, a final judicial determination, a portion of such amounts equal to the Repayment Amount. The "*Repayment Amount*" with respect to the payment of benefits shall be the smallest such amount, if any, that is required to be paid to the Company so that Executive's net after-tax proceeds with respect to any payment of benefits (after taking into account the payment of the Excise Tax and all other applicable taxes imposed on such payment) are maximized. The Repayment Amount with respect to the payment of benefits shall be zero if a Repayment Amount of more than zero would not result in Executive's net after-tax proceeds with respect to the payment of such benefits being maximized. If the Excise Tax is not eliminated pursuant to this paragraph, Executive shall pay the Excise Tax.

Notwithstanding any other provision of this Subsection (b), if (i) there is a reduction in the payment of benefits as described in this Subsection (b), (ii) the IRS later determines that Executive is liable for the Excise Tax, the payment of which would result in the maximization of Executive's net after-tax proceeds (calculated as if Executive's benefits had not previously been reduced), and (iii) Executive pays the Excise Tax, then the Company shall pay to Executive those benefits which were reduced pursuant to this Subsection (b) as soon as administratively possible after Executive pays the Excise Tax, so that Executive's net after-tax proceeds with respect to the payment of benefits are maximized.

10. <u>Term of Agreement</u>. This Agreement shall continue in full force and effect until the third anniversary of the Effective Date (the "*Initial Term*"), and shall automatically renew for additional one (1) year renewal periods (a "*Renewal Term*") if Executive is employed by the Company on the last day of the Initial Term and on each Renewal Term; provided, however, that within the sixty (60) to ninety (90) day period prior to the expiration of the Initial Term or any Renewal Term, at its discretion, the Board may propose for consideration by Executive, such amendments to the Agreement as it deems appropriate. If Executive's employment with the Company terminates during the Initial Term or a Renewal Term (collectively, a "*Term*"), this Agreement shall remain in effect until all of the obligations of the parties hereunder are satisfied or have expired.

11. Loyalty; Non-Competition; Non-Solicitation; Non-Disparagement.

(a) During Executive's employment by the Company, Executive shall devote Executive's full business energies, interest, abilities and productive time to the proper and efficient performance of Executive's duties under this Agreement. Notwithstanding the foregoing, Executive may: (1) serve on the Board of Directors of other for-profit corporate entities, with the prior written consent of the Company's Board and (2) devote time to personal investments, philanthropic, educational and civic service, and other personal matters, so long as such activities do not interfere with the performance of his duties hereunder.

(b) Agreement not to Participate in Company's Competitors. During the Term, Executive agrees not to acquire, assume or participate in, directly or indirectly, any position, investment or interest known by Executive to be adverse or antagonistic to the Company, its business, or prospects, financial or otherwise, or in any company, person, or entity that is, directly or indirectly, in competition with the business of the Company or any of its Affiliates (as defined below). Ownership by Executive, in professionally managed funds over which the Executive does not have control or discretion in investment decisions, or as a passive investment, of less than two percent (2%) of the outstanding shares of capital stock of any corporation with one or more classes of its capital stock listed on a national securities exchange or publicly traded on a national securities exchange or in the over-the-counter market shall not constitute a breach of this Section. For purposes of this Agreement, *"Affiliate,"* means, with respect to any specific entity, any other entity that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified entity.

(c) For a period of twelve (12) months following the termination of Executive's employment with the Company for any reason, voluntary or involuntary (the "***Restricted Period***"), Executive shall not: (i) solicit or induce, or attempt to solicit or induce, any employee of the Company, including all Development Team Members identified in Exhibit B hereto, or its Affiliates to leave the employ of the Company or such Affiliate; or (ii) use confidential information to solicit or attempt to solicit the business of any client or customer of the Company or its Affiliates with respect to products, services, or investments similar to those provided or supplied by the Company or its Affiliates.

(d) During the Restricted Period, Executive shall not disparage the Company, or its officers, directors, employees, shareholders, or agents, in any manner likely to be harmful to its or their businesses, business reputations, or personal reputations and the Company shall not disparage Executive in a manner likely to be harmful to his business reputation or personal reputation, provided that Executive and the Company will respond accurately and fully to any question, inquiry or request for information when required by legal process.

12. Successors and Binding Agreement.

(a) The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation, reorganization or otherwise) to all or substantially all of the business or assets of the Company, by agreement in form and substance reasonably satisfactory to the Executive, expressly to assume and agree to perform this Agreement in the same manner and to the same extent the Company would be required to perform if no such succession had taken place. This Agreement will be binding upon and inure to the benefit of the Company and any successor to the Company, including without limitation any persons acquiring directly or

13

indirectly all or substantially all of the business or assets of the Company whether by purchase, merger, consolidation, reorganization or otherwise (and such successor will thereafter be deemed the "Company" for the purposes of this Agreement), but will not otherwise be assignable, transferable or delegable by the Company.

(b) This Agreement will inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, and legatees. This Agreement will supersede the provisions of any employment, severance or other agreement between the Executive and the Company that relate to any matter that is also the subject of this Agreement, and such provisions in such other agreements will be null and void.

(c) This Agreement is personal in nature and neither of the parties hereto will, without the consent of the other, assign, transfer or delegate this Agreement or any rights or obligations hereunder except as expressly provided in Sections 10(a) and 10(b). Without limiting the generality or effect of the foregoing, the Executive's right to receive payments hereunder will not be assignable, transferable or delegable, whether by pledge, creation of a security interest, or otherwise, other than by a transfer by the Executive's will or by the laws of descent and distribution and, in the event of any attempted assignment or transfer contrary to this Section 10(c), the Company will have no liability to pay any amount so attempted to be assigned, transferred or delegated.

13. <u>Notices</u>. For all purposes of this Agreement, all communications, including without limitation notices, consents, requests or approvals, required or permitted to be given hereunder will be in writing and will be deemed to have been duly given when hand delivered or dispatched by electronic facsimile transmission (with receipt thereof orally confirmed), or five (5) business days after having been mailed by United States registered or certified mail, return receipt requested, postage prepaid, or three business days after having been sent by a nationally recognized overnight courier service such as FedEx or UPS, addressed to the Company (to the attention of the Secretary of the Company) at its principal executive office and to the Executive at his principal residence, or to such other address as any party may have furnished to the other in writing and in accordance herewith, except that notices of changes of address will be effective only upon receipt.

14. <u>Section 409A of the Code</u>.

(a) <u>Interpretation</u>. Notwithstanding the other provisions hereof, this Agreement is intended to comply with the requirements of section 409A of the Code, to the extent applicable, and this Agreement shall be interpreted to avoid any penalty sanctions under section 409A of the Code. Accordingly, all provisions herein, or incorporated by reference, shall be construed and interpreted to comply with section 409A of the Code and, if necessary, any such provision shall be deemed amended to comply with section 409A of the Code and regulations thereunder. If any payment or benefit cannot be provided or made at the time specified herein without incurring sanctions under section 409A of the Code, then such benefit or payment shall be provided in full at the earliest time thereafter when such sanctions will not be imposed. Any amount payable under this Agreement that constitutes deferred compensation subject to section 409A of the Code shall be paid at the time provided under this Agreement or such other time as permitted under section 409A of the Code. No interest will be payable with respect to any amount paid within a time period permitted by, or delayed because of, section 409A of the Code. All payments to be

DocuSign Envelope ID: 7FFCF513-8B56-42BB-B374-7355652520402

made upon a termination of employment under this Agreement that are deferred compensation may only be made upon a "separation from service" under section 409A of the Code. For purposes of section 409A of the Code, each payment made under this Agreement shall be treated as a separate payment. In no event may Executive, directly or indirectly, designate the calendar year of payment.

(b) <u>Payment Delay</u>. To the maximum extent permitted under section 409A of the Code, the severance benefits payable under this Agreement are intended to comply with the "short-term deferral exception" under Treas. Reg. §1.409A-1(b)(4), and any remaining amount is intended to comply with the "separation pay exception" under Treas. Reg. §1.409A-1(b)(9)(iii); provided, however, any amount payable to Executive during the six (6) month period following Executive's Termination Date that does not qualify within either of the foregoing exceptions and constitutes deferred compensation subject to the requirements of section 409A of the Code, then such amount shall hereinafter be referred to as the "Excess Amount." If at the time of Executive's separation from service, the Company's (or any entity required to be aggregated with the Company under section 409A of the Code) stock is publicly-traded on an established securities market or otherwise and Executive is a "specified employee" (as defined in section 409A of the Code and determined in the sole discretion of the Company (or any successor thereto) in accordance with the Company's (or any successor thereto) "specified employee" determination policy), then the Company shall postpone the commencement of the payment of the portion of the Excess Amount that is payable within the six (6) month period following Executive's Termination Date with the Company (or any successor thereto) for six (6) months following Executive's Termination Date with the Company (or any successor thereto). The delayed Excess Amount shall be paid in a lump sum to Executive within ten (10) days following the date that is six (6) months following Executive's Termination Date with the Company (or any successor thereto). If Executive dies during such six (6) month period and prior to the payment of the portion of the Excess Amount that is required to be delayed on account of section 409A of the Code, such Excess Amount shall be paid to the personal representative of Executive's estate within sixty (60) days after Executive's death.

(c) <u>Reimbursements</u>. All reimbursements provided under this Agreement shall be made or provided in accordance with the requirements of section 409A of the Code, including, where applicable, the requirement that (i) any reimbursement is for expenses incurred during Executive's lifetime (or during a shorter period of time specified in this Agreement), (ii) the amount of expenses eligible for reimbursement during a calendar year may not affect the expenses eligible for reimbursement in any other calendar year, (iii) the reimbursement of an eligible expense will be made on or before the last day of the taxable year following the year in which the expense is incurred, and (iv) the right to reimbursement is not subject to liquidation or exchange for another benefit. Any tax gross up payments to be made hereunder shall be made not later than the end of Executive's taxable year next following Executive's taxable year in which the related taxes are remitted to the taxing authority.

15. <u>Governing Law</u>. The validity, interpretation, construction and performance of this Agreement will be governed by and construed in accordance with the substantive laws of the State of California, without giving effect to the principles of conflict of laws of such State.

16. <u>Validity</u>. If any provision of this Agreement or the application of any provision hereof to any person or circumstances is held invalid, unenforceable or otherwise illegal, the remainder

DocuSign Envelope ID: 3FFCF518-9B56-42BB-B374-7355652520 4D

of this Agreement and the application of such provision to any other person or circumstances will not be affected, and the provision so held to be invalid, unenforceable or otherwise illegal will be reformed to the extent (and only to the extent) necessary to make it enforceable, valid or legal.

17. <u>Miscellaneous</u>. No provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing signed by the Executive and the Company. No waiver by either party hereto at any time of any breach by the other party hereto or compliance with any condition or provision of this Agreement to be performed by such other party will be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. No agreements or representations, oral or otherwise, expressed or implied with respect to the subject matter hereof have been made by either party that are not set forth expressly in this Agreement. References to Sections are to references to Sections of this Agreement. Any reference in this Agreement to a provision of a statute, rule or regulation will also include any successor provision thereto.

18. <u>Board Membership</u>. At each annual meeting of the Company's stockholders prior to the Termination Date, the Company will nominate Executive/and or appointee of Executive to serve as a member of the Board. Executive's or appointee's service as a member of the Board will be subject to any required stockholder approval. Upon the termination of Executive's employment for any reason, unless otherwise requested by the Board, Executive agrees to resign from the Board (and all other positions held at the Company and its affiliates), and Executive, at the Board's request, will execute any documents necessary to reflect his resignation.

19. <u>Indemnification and D&O Insurance</u>. Executive will be provided indemnification to the maximum extent permitted by the Company's and its subsidiaries' and affiliates' Articles of Incorporation or Bylaws, including, if applicable, any directors and officers insurance policies, with such indemnification to be on terms determined by the Board or any of its committees, but on terms no less favorable than provided to any other Company executive officer or director and subject to the terms of any separate written indemnification agreement.

20. <u>Employee Benefits</u>. Executive will be eligible to participate in the Company employee benefit plans, policies and arrangements that are applicable to other executive officers of the Company, as such plans, policies and arrangements may exist from time to time and on terms at least as favorable as provided to any other executive officer of the Company.

20. <u>No Duplication of Benefits</u>. The benefits provided to Executive in this Agreement shall offset substantially similar benefits provided to Executive pursuant to another Company policy, plan or agreement.

21. <u>Survival</u>. Notwithstanding any provision of this Agreement to the contrary, the parties' respective rights and obligations under Sections 2 and 3, will survive any termination or expiration of this Agreement or the termination of the Executive's employment for any reason whatsoever.

22. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same agreement.

23. <u>Trade Secrets of Others.</u> It is the understanding of Company and Executive that Executive shall not divulge to the Company and/or its subsidiaries any confidential information or trade secrets belonging to others, including Executive's former employers, nor shall the Company and/or its Affiliates seek to elicit from Executive any such information. Consistent with the foregoing, Executive shall not provide the Company and/or its Affiliates, and the Company and/or its Affiliates shall not request, any documents or copies of documents containing such information.

24. <u>Enforcement: Remedies Upon Breach.</u> I understand that the restrictions contained in this Agreement are intended for the protection of the Company's interests in its Intellectual Property, customer, client, merchant, and other business relationships, and goodwill, and are necessary, reasonable and appropriate purpose. I recognize and agree that any breach of this Agreement is likely to cause the Company substantial and irrevocable damages and irreparable harm (and that it may be difficult to measure any damages that might be caused to the Company from any breach). I also acknowledge and agree that (i) without the obligation/restrictions undertaken by me in this Agreement, I would be in a position to compete unfairly with the Company, and (ii) my education and experience are such that those obligations/restrictions will not unreasonably interfere with my ability to earn a livelihood. Accordingly, in the event of such breach of this Agreement by me, the Company, in addition to such other remedies which may be available, will be entitled to specific performance and to temporary, preliminary and permanent injunctive relief (in addition to all other remedies it may have for damages or otherwise, in law or equity) to restrain such breach or threatened breach, without proving actual damages and without posing of a bond.

25. <u>Commitment to Company; Avoidance of Conflict.</u> While an Executive of the Company, I will devote my full-time efforts to the Company's business, and I will not engage in any other business activity that conflicts with my duties to the Company. I will advise the Chief Executive Officer of the Company or his or her nominee/designee at such time as any activity of either the Company or another business presents me with a conflict of interest or the appearance of a conflict of interest as an Executive of the Company. I will take whatever action is required is requested of me by the Company to resolve any conflict or appearance of conflict which it finds to exist.

26. <u>Advertising waiver.</u> Executive agrees to permit the Company, and persons or other organizations authorized by the Company, to use, publish and distribute advertising or sales promotional literature concerning the products and/or services of the Company, or the machinery and equipment used in the provision thereof, in which Executive's name and/or pictures of Executive taken in the course of Executive's provision of services to the Company appear. Executive hereby waives and releases any claim or right Executive may otherwise have arising out of such use, publication or distribution.

**IN WITNESS WHEREOF**, the Parties have executed this Executive Employment Agreement as of the date first above written.

<u>**COMPANY:**</u>

Business Warrior Corporation

By: _____
Name: Jonathan Brooks
Title: President and Vice Chairman

Attn: Jonathan Brooks

<u>**EXECUTIVE:**</u>

_____
Name: Timothy Li
Address: _____
Address: _____
Email: _____

18

## SCHEDULE A

Set forth below are reserved Inventions/Intellectual Property made or conceived by me and in conjunction with the Development Team prior to my employment with the Company which I own or in which I claim an ownership interest and should be considered a "Work Made for Hire" as the phrase is defined in the U.S. patent laws and shall be owned by and for the express benefit of the Company and their respective subsidiaries and affiliates. In the event it should be established that such work does not qualify as a Work Made for Hire, Executive agrees to and does hereby assign to the Company, and their respective affiliates and subsidiaries, all of his rights, title, and/or interest in such work product, including, but not limited to, all copyrights, patents, trademarks, and propriety rights.

(If none, mark none)

Awcore and Thecode have created the source code and supporting codes for FluidFi Inc. DBA Alchemy Technologies.

_____

Timothy Li

Date: June _12_, 2022

DocuSign Envelope ID: 7FFCF513-9BF6-42BB-B374-7355652520AD

## SCHEDULE B

DEVELOPMENT TEAM MEMBERS

Awcore and Thecode are the development companies contracted with FluidFi Inc.

**DocuSign**

## Certificate Of Completion

Envelope Id: 7FFCF5136BE642BBB3747255652E204D                          Status: Completed
Subject: Please DocuSign: Business Warrior Corporation - Executive Employment Agreement (Tim Li) - 06-08...
Source Envelope:
Document Pages: 20                    Signatures: 3                    Envelope Originator:
Certificate Pages: 5                  Initials: 1                      Jonathan Brooks
AutoNav: Enabled                                                       3808 E Monterosa St
EnvelopeId Stamping: Enabled                                           Suite 105
Time Zone: (UTC-08:00) Pacific Time (US & Canada)                      Phoenix, AZ 85018
                                                                       jbrooks@businesswarrior.com
                                                                       IP Address: 70.171.230.251

## Record Tracking

Status: Original                      Holder: Jonathan Brooks           Location: DocuSign
       6/8/2022 4:24:33 PM                    jbrooks@businesswarrior.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Jonathan Brooks<br>jbrooks@businesswarrior.com<br>President & Director<br>Business Warrior<br>Security Level: Email, Account Authentication<br>(None) | DocuSigned by:<br>*Jonathan Brooks*<br>4FD5052E82EF4DA...<br><br>Signature Adoption: Pre-selected Style<br>Signed by link sent to jbrooks@businesswarrior.com<br>Using IP Address: 70.171.230.251<br>Signed using mobile | Sent: 6/8/2022 4:27:09 PM<br>Viewed: 6/8/2022 7:59:51 PM<br>Signed: 6/8/2022 8:00:00 PM |
| **Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | | |
| Timothy Li<br>timothy.li@trustalchemy.com<br>Founder & CEO<br>Alchemy<br>Security Level: Email, Account Authentication<br>(None) | DocuSigned by:<br>*Timothy Li*<br>99CFE45EBE27413...<br><br>Signature Adoption: Pre-selected Style<br>Signed by link sent to timothy.li@trustalchemy.com<br>Using IP Address: 76.89.76.255 | Sent: 6/8/2022 4:27:09 PM<br>Resent: 6/10/2022 6:15:58 AM<br>Viewed: 6/12/2022 8:09:29 PM<br>Signed: 6/12/2022 8:11:18 PM |
| **Electronic Record and Signature Disclosure:**<br>   Accepted: 6/12/2022 8:09:29 PM<br>   ID: 7c6b7bb3-c257-4af6-89b5-975978090dcf | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 6/8/2022 4:27:09 PM |
| Certified Delivered | Security Checked | 6/12/2022 8:09:29 PM |
| Signing Complete | Security Checked | 6/12/2022 8:11:18 PM |
| Completed | Security Checked | 6/12/2022 8:11:18 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 1/4/2018 12:46:35 PM
Parties agreed to: Timothy Li

## CONSUMER DISCLOSURE

From time to time, BLUUME LLC (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures

electronically from us.

**How to contact BLUUME LLC:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: legal@bluume.com


**To advise BLUUME LLC of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at legal@bluume.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from BLUUME LLC**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to legal@bluume.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with BLUUME LLC**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
>
> ii. send us an e-mail to legal@bluume.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
|---|---|
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | Allow per session cookies |

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to

other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC CONSUMER DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify BLUUME LLC as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  BLUUME LLC during the course of my relationship with you.